United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BRENDA PENHALL,

Plaintiff,

v.

LAKE COUNTY PROBATION
DEPARTMENT, et al.,

Defendants.

Case No.  19-cv-03769-CRB

**ORDER GRANTING SUMMARY JUDGMENT**

This case concerns the termination of Plaintiff Brenda Penhall's employment from the Lake County Probation Department (LCPD) when she failed to complete a required training program following her return from medical leave.  Penhall argues that LCPD and her former boss, Robert Howe (collectively, "Defendants"), violated the Americans with Disabilities Act (ADA) and the California Fair Employment and Housing Act (FEHA). FAC (dkt. 28).  Defendants now move for summary judgment.  Mot. (dkt. 64).  As explained below, the Court grants the motion.

I.    **BACKGROUND**

A.    **Parties**

Plaintiff Brenda Penhall was an employee of Lake County's Probation Department. Mot. App. (dkt. 64-2) Ex. 11 at 123*.

Defendant LCPD is a local governmental agency and Penhall's former employer. Id.  Defendant Robert Howe is the Chief Probation Officer at LCPD and Penhall's former boss.  Howe Decl. (dkt. 64-2) ¶ 1.

**B.      Factual Background**

Penhall began working for Lake County as an Eligibility Worker III with the Department of Social Services on December 7, 2007.  Penhall Depo. (dkt. 64-2)[1] at 8:11–15.  On May 8, 2013, LCPD hired Penhall as a Welfare Fraud Investigator Trainee ("Trainee").  Mot. App. Ex. 11 at 123*.

**1.      The Job**

Penhall's daily tasks as a Welfare Fraud Investigator Trainee involved working in the back office, going out to interview potential suspects, and picking up surveillance at stores.  Penhall Depo. at 37:10–17.  Anytime Penhall did fieldwork, her supervisor, Mike Owens, would accompany her.  Id. at 37:21–38:3.

To qualify as a Welfare Fraud Investigator ("Fraud Investigator"), a Trainee like Penhall must complete training.  Mot. App. Ex. 7 at 101*.  The job description for the Fraud Investigator position allows completion of either (1) the P.O.S.T. Certified Police Academy ("Police Academy") training or (2) the less physically demanding P.O.S.T. Certified Specialized Investigator Course ("Specialized Investigator Course") training.  Howe Depo. (dkt. 69-2)[2] at 51:20–25, 52:1–16.  The job description also specifies that the training should be completed within 12 months of employment.  See id. at 81:18-25.

Discretion regarding which of the two trainings is appropriate rests with the head of LCPD, Defendant Howe.  Mot. App. Ex. 10 at 120*–21*.  For the last thirty years, LCPD has consistently required all Investigator Trainees to complete the Police Academy.  Howe Depo. at 52:21–24.  Howe considers the Police Academy to be superior for the Fraud Investigator position because Fraud Investigators are armed police officers who effectuate arrests and serve warrants.  Id. at 52:17–21.  When Penhall applied for the Trainee position, she knew that she would have to complete the Police Academy to become a Fraud Investigator.  Penhall Depo. at 16:6–11.

---

[1] Excerpts of Penhall's deposition are also at dkt. 69-2.
[2] Excerpts of Howe's deposition are also at dkt. 64-2.

United States District Court
Northern District of California

### 2.     Injury and Medical Leave

In January 2014, Penhall enrolled in the "modular" version of the Police Academy, which consisted of three modules over the course of one year.  Id. at 16:17-19.  This modular version of the academy allowed Penhall to stay home more with her children.  Id. at 17:6–22.  Penhall completed two of the three modules, but then sustained injuries to her knees, right shoulder, and right elbow during her training for the final module.  Mot. App. Ex. 13 at 135*.  Her first injury was in March 2014, and her second injury was in July 2014.  Penhall Depo. at 23:16–26.  Due to her injuries, she left the Police Academy in September 2014, and returned to LCPD to work as a Trainee under Mike Owens in December 2014.  Id. at 76:14–16.

From December 2014 to December 2015, Penhall took a leave for a knee surgery.  Id. at 41:2–4.  During this time, she was sometimes placed on light duty, though she does not remember for how long.  Id. at 41:17–42:3.

From December 2015 to September 2017, Penhall took a medical leave for a shoulder surgery.  Id. at 42:5–9.  During this time, she was treated by Dr. Noah Weiss.  Mot. App. Ex. 13 at 135*.  LCPD held the one-year training requirement in abeyance for Penhall for four years due to her injury.  Howe Depo. at 81:18–22.

### 3.     Return to Work

On September 12, 2017, Penhall returned to work as a Trainee.  Penhall Depo. at 44:6–8, 61:4–6.  Dr. Weiss had cleared Penhall to return to work.  Id. at 44:14–21.  That clearance was with "no restrictions."  Id. at 68:5–6, 74:8–11.

During a meeting on September 12, Howe informed Penhall that she should enroll in the October 2017 San Jose Police Academy and complete all three modules again, because too much time had passed for Penhall only to complete the final module.  Id. at 85:5–8.  Penhall inquired about the possibility of attending the less physically demanding Specialized Investigator Course because of her injuries.  Id. at 85:12–14.  Penhall claims that at the time of the meeting, she had no intent to "request" to be placed in the Specialized Investigator Course.  Id. at 64:14–17.  She did not tell Howe that she thought

3

United States District Court
Northern District of California

she would be re-injured if she attended the Police Academy, nor that she believed that Dr. Weiss had restricted her from attending the Police Academy.  Id. at 67:21–68:4.  Instead, she told Howe that Dr. Weiss released her with no restrictions because Dr. Weiss believed that she would have until July 2018 to build up her strength to finish the final module.  Id. at 68:5–19.

Howe responded, "I know of no injuries," and "your doctor released you with no restrictions, so, therefore, in my eyes you have no injuries."  Id. at 85:15–19.  When Penhall tried to explain her injuries, Howe cut her off.  Id. at 85:10–19.

Shortly after this meeting, Penhall contacted Dr. Weiss to clarify her medical conditions and discuss the prospect of enrolling in the Police Academy course in October.  Id. at 92:2–10.  Around September 27, 2017, Dr. Weiss provided Penhall with a note stating that she was released to return to work as a Trainee but could not attend the Police Academy until January 2018.  Id.; Penhall Decl. (dkt. 69-3) Ex. 2.[3]  As a result, Penhall did not attend the October 2017 Police Academy.  Penhall Depo. at 91:23–25.

After the meeting on September 12, 2017, Howe directed Michael Owens to confine Penhall's activities to office work, and prohibited her from shadowing Fraud Investigators on field visits or attending Fraud Investigators' and Trainees' monthly "range days" and "use-of-force" trainings.  Owens Depo. (dkt. 69-2) at 32:9–24, 33:5–14.  Also, Penhall was not permitted to attend the annual welfare fraud investigators' state-wide training conference in October 2017.  Id. at 49:9–17.

---

[3] The FAC alleges that "On September 27, 2017, Dr. Weiss submitted a medical note indicating that Plaintiff's disability precluded her from enrolling in the P.O.S.T. course." FAC ¶ 31.  Dr. Weiss created two documents on September 27, 2017, neither of which talk about a "disability."  The first, the "release to return to work" note, states: "Meets all aspects of job description for Welfare Fraud Investigator – Not yet ready for POST training – Anticipate ready in 3 months."  Penhall Decl. Ex. 1.  The second, a longer medical record, discusses Penhall's medical condition, see, e.g., Penhall Decl. Ex. 2 at 8 of 15 ("There is some mild ongoing tenderness over the lateral epicondyle and radial tunnel"), and states, among other things, "I do feel that she can do all aspects of her job as welfare fraud investigator but there are certain aspects of her POST training such as dragging 155 pound body, that she is not yet ready for," id. at 7 of 15.  See also id. at 8 of 15 ("The patient can continue to work at her usual and customary duties as a welfare fraud investigator.  I do not think she is yet ready to start POST training.  Hopefully, she will be ready in about three months.").

United States District Court
Northern District of California

1    Howe contends that he "gave . . . the instruction at one point not to enroll Ms.

2  Penhall in physical training," but he "do[esn]'t recall the shadowing being discussed at that

3  point.  [He] do[esn]'t recall denying her ability to do that."  Howe Depo. at 80:3–7.  He

4  explains as to the range days and use-of-force trainings that "neither of those trainings

5  were necessary and required. . . . [G]iven her own concerns. . . that she would get injured

6  at the [A]cademy, I didn't feel it was wise . . . [t]o have her . . . attend the training that

7  essentially would be what you would attend at the academy."  Id. at 50:12–21.

8             **4.    Release Without Restrictions**

9    After Howe received a communication from Dr. Weiss restricting Penhall from

10  attending the October 2017 Police Academy, Howe sent Dr. Weiss a Physician's Physical

11  Clearance and Limitation Form.  Id. at 44:5–8; see Mot. App. Ex. 6.  The form lists the

12  physical requirements of the Basic Police Academy and asks the patient's physician

13  whether or to what degree the patient is cleared to participate.  Mot. App. Ex. 6 ("During

14  the Basic Police Academy, recruits perform the physical activities listed below.").[4]

15    On December 13, 2017, Dr. Weiss sat for a deposition in Penhall's workers'

16  compensation case before the Workers' Compensation Appeals Board of the State of

17  California.  See Mot. App. Ex. 13.  During the deposition, Dr. Weiss expressed

18  reservations about Penhall's ability as of the day of the deposition to complete the Police

19  Academy's physical tasks, such as climbing and dragging a 165-pound person.  Id. at 9:6–

20  15, 17:17, 21:1.  Dr. Weiss said, "right now, she feels she cannot do these activities."  Id.

21  at 10:4–5.  Dr. Weiss then stated that January 2018 would be a reasonable time for Penhall

22  to reach a "permanent and stationary status," at which point Penhall would either

23  successfully finish the Police Academy or not.  Id. at 18:12–18.  Dr. Weiss reviewed a list

24  of the physical requirements of the Specialized Investigator Course, and the defendant's

25

26  ───────────────

27  [4] The form goes on to say "Please indicate by marking the event(s) the patient CAN
participate in.  Physician: Please check APPROVED activity."  Id. at 95*.  Dr. Weiss did
not check any of the listed items, but his comments at the conclusion of the form,

28  discussed below, remove any doubt about his view of Penhall's capabilities.  Penhall does
not argue that the lack of check marks next to particular activities has any significance.

5

United States District Court
Northern District of California

1    counsel asked him whether Penhall could complete those requirements as of the day of the

2    deposition.  See id. at 21:8–22:18, 25:7–19.  Dr. Weiss said "yes."  Id.

3         Penhall received Dr. Weiss's deposition testimony, but never provided any of it to

4    Howe.  Penhall Depo. at 96:11–14.

5         On December 20, 2017, Dr. Weiss completed the Physician's Physical Clearance

6    and Limitation Form.  See Mot. App. Ex. 6.  At the conclusion of the form, Dr. Weiss

7    wrote "Yes, Full duties" in response to the question "[i]s the recruit cleared for full and

8    unrestricted participation in the police academy."  Id. at 98*.  Howe interpreted this to

9    mean that Penhall was cleared to attend the Police Academy without any physical

10   restrictions or disabilities, as of the date of Dr. Weiss's signature.  Howe Depo. at 44:5–8.

11   Dr. Weiss wrote "12/21/17" as the "Return to Full Duty Date" on the form.  See Mot. App.

12   Ex. 6 at 98*.

13        After Howe received the form from Dr. Weiss, he started the process of enrolling

14   Penhall in the Napa State College Police Academy.  Id. at 41:10–14.[5]

15        **5.     Grievance and Disenrollment from the January Police Academy**

16        On January 24, 2018, two days prior to reporting to the Napa State College Police

17   Academy to enroll, Penhall filed a grievance challenging LCPD's decision to require her to

18   attend the Police Academy and asking instead to attend the Specialized Investigator

19   Course.  Mot. App. Ex. 7 at 100*–101*.  In the grievance, Penhall stated that "While [she]

20   is fully released for work, her physician is on record stating concerns that attempting to

21   complete the Basic P.O.S.T Academy this soon is highly likely to result in re-injuries."  Id.

22   at 101*.  She urged that the County not "subject [her] to the unnecessary risk of further

23   injury when" the Specialized Investigator Course would "serve as a reasonable

24   accommodation."  Id.[6]  Penhall explained in her deposition later that her concern for re-

25

26   ─────────────
     [5] It appears that enrollment for the academy was supposed to occur in January 2018 but
27   that the academy itself did not start until April 2018.  See id. at 42:7–9 ("That academy
     wasn't due to start for several months"); Opp'n at 14 (asserting without citation that
28   "Howe confirmed that the course was not scheduled to begin until April").
     [6] In the grievance, Penhall also alleged that the County violated California Penal Code §

                                                6

injury was based on Dr. Weiss's deposition testimony in December of 2017, which Penhall received but never provided to Howe.  Penhall Depo. at 94:21–95:8, 95:9–13, 96:11–14.

Upon learning of the grievance, Howe instructed his colleague to disenroll Penhall from the January Napa State College Police Academy until he knew the outcome of the grievance process.  Howe Depo. at 38:25–39:4, 41:5–7, 41:15–42:11.  According to Howe, if the Board allowed Penhall to attend the Specialized Investigator Course, it would have been a financial waste to send Penhall to the January Police Academy.  Id. at 42:9–11 ("I didn't want to spend the county money or wasting [sic] Ms. Penhall's time on an academy if that wasn't going to be the course of action."), 53:1–5, 53:7–22.

Howe did not seek additional medical evaluations or any other information in light of Penhall's concerns.  Howe Depo. at 45:15–46:6.  Howe explained that he did not see a need to do so because he had obtained a release form from Dr. Weiss.  Id.

On January 26, 2018, Penhall reported to the Napa State College Police Academy, but learned that the County did not provide the College with the required letter of sponsorship.  Penhall Depo. at 99:14–23.  Consequently, Penhall could not enroll in the Academy.  Id.  Penhall later testified that she was willing to enroll in the Napa Police Academy despite hoping to attend the Specialized Investigator Course because she wanted to complete her career goal.  Id. at 100:13–18.  Penhall testified that she never refused to go to a regular academy, and that despite her grievance, if the Police Academy was the only option, she would still do it.  Id. at 101:7–11, 122:2–20.

### 6. Penhall-Howe Meeting and Howe Response to Grievance

On February 6, 2018, Penhall and her Union representative, Joe Wildman, met with

832.25, which states that "[n]ot withstanding any other provision of law, welfare fraud investigators or inspectors who are appointed as peace officers pursuant to subdivision (a) of 830.35 on or after January 1, 2021, shall attend and complete a specialized investigator basic course approved by the Commission on Peace Office Standards and Training within one year of being hired as a welfare investigator or inspector."  Mot. App. Ex. 7 at 101*– 02*.  Both the Human Resources Director and the Board of Supervisors later found this argument invalid because Penhall was not a peace officer.  See Mot. App. Exs. 9, 10.

United States District Court
Northern District of California

Howe.  Penhall Depo. at 116:4–6.  Penhall told Howe that requiring her to attend the Police Academy would put her at an undue risk of re-injury.  Id.

Howe responded that Penhall's argument about re-injury was new to him, as Dr. Weiss, via the clearance form, had released Penhall without restrictions after considering the Police Academy's physical requirements.  Howe Depo. at 44:1–13 ("I had nothing before me other than a complete medical release.").  Howe interpreted Penhall's argument about re-injury as a refusal to attend the Police Academy.  Id. at 56:6–12.

On February 15, 2018, Howe issued a memorandum responding to Penhall's grievance.  See Mot. App. Ex. 8.  He wrote that he did not see the "necessity of any accommodation," because "the most recent notice" he received from Dr. Weiss was the December 20, 2017 Physician's Physical Clearance & Limitation Form, which cleared Penhall for participation in the Police Academy without restrictions.  Id. at 112*.  Howe also wrote that Penhall had claimed to be unaware of the release form, and stated that she would contact Dr. Weiss herself, but that Howe, at the time of writing, had not heard whether Penhall had done so.  Id.

### 7.    Human Resources Director's Response to Grievance

In March 2018, Penhall submitted her grievance to Human Resources Director Kathy Ferguson.  Penhall Depo. at 118:8–11.  On March 23, 2018,  Ferguson responded to the grievance via email.  See Mot. App. Ex. 9.  Ferguson affirmed Howe's decision to not enroll Penhall in the Specialized Training Course.  Id. at 116*.  Ferguson wrote that Penhall was not entitled to a "reasonable accommodation" because "[t]he reasonable accommodation process starts with a doctor's written restrictions.  [Penhall] state[d] in [her] grievance that [she] ha[d] been released to full duty by [her] physician without restriction."  Id. at 115*.  Moreover, Ferguson wrote that "[i]t is within the scope of the Chief Probation Officer's authority to select and authorize payment for the training he believes will best prepare [Penhall] for [Penhall]'s future duties as an Investigator."  Id. at 116*.

United States District Court
Northern District of California

**8.      County Board of Supervisors' Hearing of Grievance and Decision**

On April 24, 2018, the County Board of Supervisors held a hearing regarding the grievance.  See Mot. App. Ex. 10.  Penhall contends that the hearing was presided over by "the Chair of the Board, along with a couple of other supervisors who participated in the decision."[7]  Penhall Decl. ¶ 3.

Penhall was represented by counsel at the hearing and does not remember if she testified.  Penhall Depo. at 124:11–20.  Penhall contends that neither Howe nor any other County witness testified at the hearing, so her counsel did not have the opportunity to cross-examine them.  Penhall Decl. ¶ 2.[8]  Penhall also asserts that her Union did not have the opportunity to issue and serve subpoenas to compel attendance of any witness, and "only prepared statements were made" at the hearing.  Id.

The memorandum later issued by the Board of Supervisor on May 1, 2018 describes the hearing's proceedings somewhat differently.  It states, "Said hearing was held in closed session and both documentary and testimonial evidence was presented.  Based upon the written and oral evidence submitted to this Board. . . . "  Mot. App. Ex. 10 at 118*.

The Board's memorandum affirms Ferguson's response to the grievance, stating that "this grievance is ultimately based upon whether the employer or the employee has the authority to determine which of the two alternative training programs is better suited to the needs of the Department.  In this case, the Chief Probation Officer has determined that the [Police] Academy training better meets the needs of the department and he has consistently required that training of all Welfare Fraud Investigator Trainee candidates."  Mot. App.

---

[7]  Presumably Penhall is referring to the decision documented in the memorandum issued by the Board on May 1, 2018 following the hearing.  Penhall does allege that the presiding party was not neutral.  Penhall Decl. ¶ 3.  However, there is no evidence supporting that allegation.

[8]  LCPD and Howe submitted an objection to Penhall's Declaration, stating that Penhall has not demonstrated that she is sufficiently familiar with the hearing process to declare that there was no opportunity for cross-examination, and that Penhall has not pointed to any authority that the Union did not have authority to call or compel witnesses.  Objection (dkt. 71-1) at 1.  The objection is without merit.  Penhall attended the hearing herself, Penhall Depo. at 124:7-20; Penhall Decl. ¶ 2, and there was no verbatim record of the hearing to serve as a source of authority.  LCPD and Howe also fail to provide evidence for their proposition that the Union had authority to call or compel witnesses.

Ex. 10 at 120*–21*.  The memorandum does not contain notice of a right to appeal the Board's decision.  Penhall Decl. ¶ 3; see Mot. App. Ex. 10 at 118*–21*.

Penhall received a copy of the Board's memorandum, and did not appeal the decision to the California Superior Court.  Penhall Depo. at 124:21–23, 126:5–127:3.

### 9.    Termination

On May 22, 2018, Penhall again met with Howe.  Howe Depo. at 57:9–18.  Prior to the meeting, Howe denied Penhall's request for her union representative to be present during the meeting.  Penhall Depo. at 132:19–133:3.  During the meeting, Howe told Penhall that he no longer thought that the position of Fraud Investigator was a viable option for Penhall, because Penhall had failed to complete the Police Academy within one year as required.  Howe Depo. at 58:9–25.  Penhall responded that she never refused to attend the Police Academy, and that she in fact did show up to enroll in the Napa State College Police Academy.  Penhall Depo. at 134:1–13.

Howe informed Penhall that he had spoken with the Department of Social Services Director, Crystal Markytan, who would be willing to accept Penhall back to her initial position.  Howe Depo. at 58:9–25.  Howe also informed Penhall that if her former position did not interest her, Human Resources Analyst Jesse Puett would discuss other County employment options with her.  Penhall Depo. at 134:21–135:1.

Later, Penhall talked to Jesse Puett, but Puett refused to let Penhall return to her initial social worker position.  Id. at 135:2–21.

On June 6, 2018, Howe issued a Notice of Proposed Discipline and told Penhall that he proposed that her employment be terminated based on her failure to complete the minimum requirements of the Fraud Investigator position.  Mot. App. Ex. 11 at 124*.

Five days after Penhall was served with the notice, she sought care from another doctor, Dr. Wheeler, and obtained from Dr. Wheeler a letter stating that the Police Academy would "put [Penhall] at high risk for re-injury."  See Mot. App. Ex. 11.

### 10.    Skelly Hearing

On June 21, 2018, County Sheriff Brian Martin, acting as Skelly Officer, held a

Skelly Hearing regarding the Proposed Disciplinary Action of Penhall.  Penhall Depo. at 141:7–10; see Mot. App. Ex. 11.  During the hearing, Penhall presented Dr. Wheeler's letter.  Id. at 124*.  According to Penhall, there were no witnesses present for cross-examination or required to testify under penalty of perjury.  Penhall Decl. ¶ 5.[9]  She also contends that the Union did not have the authority to issue subpoenas to compel witnesses to stand, and that the hearing consisted only of brief statements made by her Union representative.  Id.  She was asked a few questions by the Sheriff.  Id.

Sheriff Martin found that Penhall failed to complete the required training within one year of employment; he reasoned that Penhall was given ample time to complete the training, and that the only reason she did not do so was a concern for re-injury.  Id. at 125*.  Further, Sheriff Martin found Dr. Wheeler's letter immaterial, as "at the time the decision was made to terminate [Penhall]'s employment, there was no documentary evidence from any medical professional that supported her claim of being at risk of injury."  Id.  Sheriff Martin found Penhall's termination justifiable.  Id. at 126*.

On August 14, 2018, Penhall was served with a Notice of Disciplinary Action, and her employment was terminated.  See Mot. App. Ex. 12.

### C.    Procedural History

Penhall filed suit on June 27, 2019.  Compl. (dkt. 1).  Defendants moved to dismiss the complaint.  Am. Mot. (dkt. 14).  The Court granted the motion with leave to amend.  Order re MTD (dkt. 25).  The Court noted, among other things, that Penhall had failed to make out a claim based on being "regarded as" disabled because "[t]he thrust of Penhall's Complaint is that Defendants failed to perceive her as having a disability, instead insisting that she participate in the basic training course because 'she had been released to return to work without any restrictions.'"  Id. at 6.

Penhall filed an amended complaint on December 30, 2019.  FAC.  It included

---

[9]  LCPD and Howe object to Penhall's Declaration, arguing that Penhall has not established that she is sufficiently familiar with the Skelly process to make representations about the proceedings.  Objection at 2.  The objection is without merit for the same reasons noted above.

claims for (1) violations of the ADA by both LCPD and Howe for discrimination against her on the basis of her disability or perceived disability, specifically by failing to accommodate her, wrongfully terminating her, and retaliating against her; (2) violation of FEHA by LCPD for discriminating against her on the basis of her disability; (3) violation of FEHA by LCPD for failure to engage in the interactive process and failure to provide reasonable accommodations; (4) violation of FEHA by both LCPD and Howe for harassing her and maintaining a hostile work environment.  FAC ¶¶ 48–99.  LCPD and Howe moved to dismiss the FAC.  Am. Mot. (dkt. 30).  The Court granted in part and denied in part Defendants' motion.[10]  Order re MTD FAC (dkt. 37).

Among other things, the Court held that Penhall had successfully alleged a wrongful termination claim and retaliation claim based on the ADA's "regarded as disabled" theory.  Id. at 8.  It explained that "[i]n her amended complaint, Penhall newly alleges that she submitted a doctor's note indicating that she was disabled, that because of this note, Lake County was aware that she was disabled, but Lake County would not allow her to complete the basic training because it perceived her as disabled.  FAC ¶¶ 31, 43." Id.; see also id. at 12 ("Penhall specifically alleges that Defendants knew about her disability.  FAC ¶ 33.").

Now Defendants move for summary judgment.  Mot.; Reply (dkt. 71).  Penhall opposes.  Opp'n (dkt. 69).  The Court had set a motion hearing for Friday, September 30, 2022, but Penhall did not appear.  See Motion Hearing (dkt. 73).  The Court took the matter under submission.  Id.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[10]  The Court rejected entirely Penhall's "disabled" theory of discrimination under the ADA, holding that, as a matter of law, Penhall was not qualified.  See Order re MTD FAC at 5–7.  The Court also rejected Penhall's failure to accommodate basis for discrimination under the ADA's "regarded as disabled" theory, holding that the ADA only requires employers to accommodate actual disabilities, not perceived disabilities.  Id. at 7.

Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

"A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2727 (3d ed. 1998)).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir.1990).  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." Id. (internal citation omitted).  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything." Id. at 1103 (internal citation omitted).  If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense.  See id.  If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.  See id.  But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.  See id.

## III.   DISCUSSION

Defendants move for summary judgment, arguing that Penhall is precluded from re-litigating the issue of reasonable accommodation that underlies all of her claims, and that Penhall has not proven the elements required for her remaining ADA and FEHA claims.  Mot.  This order first addresses the issue preclusion argument, and then addresses each of

Penhall's remaining claims.

###### A.    Issue Preclusion

Defendants argue that Penhall is precluded from re-litigating the issue of whether the Specialized Investigator Course is a reasonable accommodation for Penhall's alleged disability, because the County Board of Supervisors decided this issue at the administrative hearing, and Penhall did not seek judicial review.  Mot. at 9–11; Reply at 1.  Penhall responds that the Board's hearing fails to meet the criteria required for a preclusive administrative hearing.  Opp'n at 7.

Issue preclusion, which "bars the re-litigation of issues actually adjudicated in previous litigation," has four requirements: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits.  Snoqualmie Indian Tribe v. Washington, 8 F.4th 853, 864 (9th Cir. 2021) (quoting Janjua v. Neufeld, 933 F.3d 1061, 1065 (9th Cir. 2019)).  In determining whether issue preclusion should apply, courts must also look to public policies underlying the doctrine, including preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation. Chan v. Frazer, 620 B.R. 106, 111 (N.D. Cal. 2020).  "When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."  U.S. v. Utah Const. & Min. Co., 384 U.S. 394, 421 (1966) (internal citations omitted).  To be sufficiently "judicial" for issue preclusion purposes, an administrative hearing needs to be a "judicial-like adversary proceeding." Basurto v. Imperial Irrigation Dist., 211 Cal. App. 4th 866, 884 (2012) (internal citations omitted).  Indicia of such a "real" quasi-judicial hearing include that the hearing is conducted in an impartial manner, testimony was received under oath or affirmation, the parties are allowed to call, examine, and cross-examine witnesses, make oral and written arguments, and a verbatim record of court proceeding is created.  Id. at 878, 880.

An administrative hearing that lacks most of the above indicia is short of being quasi-judicial.  The plaintiff in Ahmadi-Kashani v. Regents of University of California, 159 Cal. App. 4th 449, 458 (2008), attended an administrative hearing in her grievance process that included no provisions for sworn testimony, no opportunities for cross-examination, and had no record of the hearing.  Although the defendant was present at the hearing, he remained silent throughout, and the plaintiff was not allowed to question him. Id.  The court held that the hearing was not of a judicial character that could have a binding effect in subsequent judicial proceeding.  Id. at 564–65.

In the instant case, it is undisputed that Penhall was represented by counsel during the hearing.  Penhall Depo. at 124:11–20.  Penhall also acknowledges that Kathy Ferguson, the Human Resources Director, argued for the Department.  Penhall Decl. ¶ 2. It is also undisputed that the Board issued a written opinion after the hearing.  See Mot. App. Ex. 10.

Other facts about the hearing are disputed.  Defendants, relying on the memorandum issued by the Board after the hearing, contend that "both documentary and testimonial evidence were presented to the Board of Supervisors."  Mot. at 7; see Mot. App. Ex. 10 at 1 ("Said hearing was held in closed session and both documentary and testimonial evidence was presented.").  However, Penhall contends that "witnesses were not produced by the Department [but] rather only prepared statements were made" at the hearing.  Penhall Decl. ¶ 2.  Penhall contends that her counsel did not "have the opportunity to cross-examine Howe—who did not testify—nor any other County witness." Id.  She also contends that her Union "did not have the opportunity to issue and serve subpoena to compel attendance of any witness."  Id.[11]  Defendants respond that Penhall "had the notice of the hearing and an opportunity to argue her case," and was "given the

---

[11]  Penhall also argues that the presiding Board of Supervisors was biased.  Penhall Decl. ¶ 3.  This argument is unsupported and unconvincing.  See Basurto, 211 Cal. App. 4th at 885 ("[S]tatutory and case law long have recognized the ability of an agency to internally adjudicate employment and other matters, even when a result favorable to the other party may result in financial gain for that party or a loss for the agency.").

15

opportunity to" call witnesses, submit evidence, and provide statements on her behalf, but they cite to no evidence to support that assertion.  Reply at 2.

The disagreement between the two parties is material.  There is a difference between not <u>having</u> an opportunity to both cross-examine and provide sworn testimonies and not <u>taking</u> the opportunity to do so.  In the former case, the Board's hearing clearly lacks the evidentiary and adversarial character of a quasi-judicial hearing, and issue preclusion should not apply.  <u>See</u> <u>Basurto</u>, 211 Cal. App. 4th at 870 (holding that an "evidentiary adversarial hearing" had a quasi-judicial character and thus preclusive effect); <u>Janjua v. Neufeld</u>, 933 F.3d 1061, 1067 (9th Cir. 2019) ("[I]ssue preclusion is inappropriate where the parties have not had a full and fair opportunity to litigate the merits of an issue.") (internal citations omitted).  In the latter case, the Board's hearing is distinguishable from the non-preclusive administrative meeting in <u>Ahmadi-Kashani</u>, where the accused had no opportunity for cross-examination or sworn testimony.  <u>See</u> 159 Cal. App. 4th at 458.  If Penhall had the opportunity to fully litigate, then the element of "full and fair opportunity to litigate" is satisfied despite her decision not to take advantage of that opportunity.

When two parties disagree about the proceedings of the hearing, a verbatim record of the hearing can serve as critical evidence to judge which party's representation is truthful.  <u>See</u> <u>Janjua</u>, 933 F.3d at 1065 ("[W]e have consistently looked to the record of the prior proceeding to determine whether an issue was in fact raised, contested, and submitted for determination.").  However, it appears that there is no verbatim record of the Board's hearing, which further speaks to the hearing's lack of judicial character.

Because there is a genuine dispute of material fact about whether Penhall did not <u>have</u> the opportunity to introduce evidence or did not <u>take</u> the opportunity to introduce evidence, the Court will not grant summary judgment on the basis of issue preclusion.[12]

---

[12]  Because there is a genuine dispute of material fact regarding whether there was a full opportunity to litigate, the Court need not decide the other requirements of issue preclusion.

1     This order now turns to Defendants' arguments that it should prevail on the

2    substantive ADA and FEHA claims.

3         **B.     Violation of the ADA (claim 1)**

4         Penhall argues that Defendants violated the ADA by (1) terminating her "because

5    they regarded her as having a disability that substantially limited her ability to perform

6    major life activities including lifting, pulling, pushing, and working," and (2) retaliating

7    against her "for asserting her rights through the union grievance procedure to receive

8    reasonable accommodations on the basis of her disability and not to be discriminated

9    against because of her disability or perceived disability."  FAC ¶¶ 60, 62.[13]

10             **1.     Wrongful Termination**

11        Under the ADA, an employer may not "discriminate against a qualified employee

12   on the basis of disability."  42 U.S.C. § 12112(a).  To establish a claim of wrongful

13   termination under the ADA, Penhall must establish that "(1) [she] is 'disabled' within the

14   meaning of the Act; (2) [she] is a 'qualified individual' within the meaning of the Act; and

15   (3) [she] was terminated because of [her] disability."  See Kaplan v. City of N. Las Vegas,

16   323 F.3d 1226, 1229 (9th Cir. 2003).  If Penhall can establish a prima facie case of

17   wrongful termination, then the burden shifts to Defendants to articulate a legitimate,

18   nondiscriminatory reason for the adverse employment action.  See Snead v. Metropolitan

19   Property & Cas. Ins. Co., 237 F.3d 1080, 1093 (9th Cir. 2001) (explaining McDonnell

20   Douglas burden shifting model).  If they do so, the burden then shifts back to Penhall to

21   demonstrate that Defendants' reason for terminating her was pretextual.  Id.

22        Defendants argue that Penhall fails to establish any of the three elements of a prima

23   facie case.  Mot. at 12–14.  The Court agrees, particularly as to whether Penhall is disabled

24   under the Act and whether she was terminated because of her disability.

25

26   _____

27   [13] Penhall's first cause of action, for discrimination under the ADA, was initially broader
     and included a "disabled" theory in addition to the "regarded as disabled" theory.  See
28   FAC ¶¶ 48–62.  It also alleged that Defendants failed to accommodate Penhall.  See id. ¶
     53.  The Court's order on the motion to dismiss the FAC narrowed this claim.  See Order
     re MTD FAC at 5–7.

As the Court has discussed in each of its previous substantive orders in this case, a plaintiff can meet the "disabled" prong under the ADA by being disabled, having a record of disability, or showing that her employer regarded her as disabled.  42 U.S.C. § 12102(1)(A)–(C); see also Order re MTD at 5; Order re MTD FAC at 5.  The only avenue left to Penhall is to establish that Defendants regarded her as disabled.  See FAC ¶ 60, Order re MTD FAC at 8.

There is no evidence that Defendants regarded Penhall as disabled.  This is a similar conclusion to the one the Court reached as to the initial complaint.  See Order re MTD at 6 (holding that Penhall failed to make out a claim based on being "regarded as" disabled because "[t]he thrust of Penhall's Complaint is that Defendants failed to perceive her as having a disability, instead insisting that she participate in the basic training course because 'she had been released to return to work without any restrictions.'").  The Court only changed its conclusion on this point because Penhall alleged in the FAC that Defendants knew, based on Dr. Weiss's September 27, 2017 note, that Penhall was disabled.  See Order re MTR FAC at 8–9 ("[i]n her amended complaint, Penhall newly alleges that she submitted a doctor's note indicating that she was disabled, that because of this note, Lake County was aware that she was disabled, but Lake County would not allow her to complete the basic training because it perceived her as disabled.  FAC ¶¶ 31, 43.").

But Dr. Weiss's September 27, 2017 note did not state that Penhall was disabled.  That note modified Dr. Weiss's initial release to work, which was with no restrictions, see Penhall Depo. at 44: 14–21, 68:5–6, 74:8–11, and stated that Penhall met all aspects of her existing Welfare Fraud Investigator position but was "not yet ready for POST training," adding that Dr. Weiss "anticipate[d]" that she would be "ready in 3 months," Penhall Decl. Ex. 1.  Dr. Weiss saying that Penhall was not yet ready for the POST training is not the same thing as saying that she is disabled, which, under the ADA, requires that she be substantially limited in her major life activities.  See 42 U.S.C. § 12102(2); see also Murphy v. United Parcel Service, Inc., 527 U.S. 516, 524 (1999) (employer must regard employee as substantially limited in major life activity, not just unable to perform a

18

particular job).  This is particularly so because Dr. Weiss was clear that Penhall's injury

was temporary.  <u>See</u> Penhall Decl. Ex. 1 ("yet," "3 months"); <u>Sanders v. Arneson Prods.,</u>

<u>Inc.</u>, 91 F.3d 1351, 1354 (9th Cir. 1996) ("Several courts have held that a

temporary injury with minimal residual effects cannot be the basis for a sustainable claim

under the ADA.").[14]  Nor does Penhall's subjective concern about re-injuring herself

demonstrate that she is substantially limited in her major life activities.  <u>See</u> <u>id.</u>

     In addition, Defendants did not terminate Penhall after receiving Dr. Weiss's

September 27, 2017 note.  Howe next sent Dr. Weiss a Physician's Physical Clearance and

Limitation Form with a list of physical requirements for review.  Howe Depo. at 44:5–8;

<u>see</u> Mot. App. Ex. 6.  Dr. Weiss returned that form on December 20, 2017, writing "Yes,

Full duties" in response to the question "[i]s the recruit cleared for full and unrestricted

participation in the police academy."  Mot. App. Ex. at 98*.  He also wrote "12/21/17" as

the "Return to Full Duty Date."  <u>See</u> Mot. App. Ex. 6 at 98*.  Dr. Weiss therefore

communicated in advance of Penhall's termination that Penhall was <u>not</u> disabled but in

fact cleared to participate in the Police Academy.  Moreover, Howe understood this.  <u>See</u>

Howe Depo. at 44:5–8 (Howe interpreted the form to mean that Penhall was cleared to

attend the Police Academy without any physical restrictions or disabilities, as of the date

of Dr. Weiss's signature).[15]  And he took steps to enroll Penhall in the January Police

Academy.  Howe Depo. at 41:10–14.

     Penhall's response is that she did not attend the Police Academy "not due to any

resistance on her part but simply because Howe decided not to proceed with her enrollment

and to do nothing to try to get her enrolled later in the year."  Opp'n at 13.  She states that

---

[14] <u>See also</u> <u>Rondon v. Wal-Mart, Inc.</u>, No. C-97-0369 MMC, 1998 WL 730843, at *4
(N.D. Cal. Oct. 8, 1998) ("While it is true that an injury which begins as temporary may
become permanent and then qualify as a disability . . . plaintiff must still demonstrate that
[her] condition had become permanent and ripened into a disability <u>at the time of</u>
<u>discharge</u>. . . . To hold otherwise would force employers to treat all injuries as
disabilities.").

[15] That Dr. Weiss, in a deposition one week earlier, expressed reservations about Penhall's
ability—on the day of the deposition—to complete the Police Academy's physical tasks
adds nothing to the notion that Defendants regarded Penhall as disabled.  Penhall admits
that she did not send the deposition to Howe.  Penhall Depo. at 96:11–14.

she reported to the academy course at Napa State College on January 26th to enroll and only then learned that the County had not submitted the required sponsorship letter.  Id. at 12.  And she insists: "Plaintiff . . . never refused to enroll in that course."  Id.

But Penhall's position discounts the significance of the grievance she filed two days before she was supposed to enroll in the Police Academy.  That grievance stated in part: "While Ms. Penhall is fully released for work, her physician is on record stating concerns that attempting to complete the Basis P.O.S.T. Academy this soon is highly likely to result in re-injuries. . . . The County should not subject Ms. Penhall to the unnecessary risk of further injury when the [Special Investigator Course] would serve as a reasonable accommodation."  Mot. App. Ex. 7.  That grievance constitutes significant "resistance on her part" to attending the Police Academy, see Opp'n at 13, stating more formally what Penhall had been saying all along: that she did not think she should have to attend it, see Penhall Depo. at 85:12–14 (at the September 12, 2017 meeting with Howe, Penhall inquired about the possibility of attending the less physically demanding Specialized Investigator Course because of her injuries).

Having received her grievance, Howe reasonably concluded that it did not make sense to force Penhall to attend the Police Academy—either for her sake or the County's— and decided instead to let the grievance process play out.  Howe Depo. at 42:9–11 (explaining that if the Board allowed Penhall to attend the Specialized Investigator Course, it would have been a financial waste to send Penhall to the January Police Academy).  The alternative—forcing an employee to attend a training that she insisted would re-injure her, before a grievance process about that very issue had been resolved—might have appeared punitive, and also might have exposed the department to liability if Penhall was indeed injured in the training.  See, e.g., Mot. at 16.

 Penhall's resistance to the academy continued beyond January.  She met with Howe about her grievance on February 6, 2018, and she again told him that requiring her to attend the Police Academy would put her at an undue risk of re-injury.  Penhall Depo. at

116:4–6.[16]  This again represents some "resistance on her part" to attending the Police Academy.  See Opp'n at 13.

Following the conclusion of the grievance process, Penhall again met with Howe. Howe Depo. at 57:9–18.  He told her that he no longer thought that the position of Fraud Investigator was a viable option for Penhall, because Penhall had failed to complete the Police Academy within one year as required.  Howe Depo. at 58:9–25.[17]  He issued a Notice of Proposed Discipline and told Penhall that he proposed that her employment be terminated based on her failure to complete the minimum requirements of the Fraud Investigator position.  Mot. App. Ex. 11 at 124*.  There is no evidence that Howe terminated Penhall because he regarded her as disabled, rather than for her failure to complete the required training.

Penhall argues that a jury "could rationally conclude that Howe was [only claiming that Penhall was refusing to participate in the Police Academy] as a pretext for forbidding [her] from satisfying the qualification requirement through the only route he would accept because he regarded [her] as disabled and simply did not want to deal with that fact in a manner consistent with [the ADA]."  Opp'n at 14.  Not so.  Dr. Weiss cleared Penhall to participate in the Police Academy as of December 21, 2017.  Mot. App. Ex. 6 at 98*. Howe stated repeatedly and consistently that he believed that Penhall was cleared and should participate in the Police Academy.  See, e.g., Howe Depo. at 44:1–13 ("I had nothing before me other than a complete medical release.").  There is no evidence that Defendants regarded Penhall as disabled, or that they terminated her because of that perceived disability.  Rather, they regarded her as able, and terminated her for failing to complete necessary training.

Accordingly, the Court concludes that Penhall fails to establish a prima facie case of

---

[16] The Skelly Memorandum states that Wildman said that "he was the person who" stated that "requiring her to attend the academy would put her at un-due risk of injury and that she didn't want to be injured again," but that Penhall "agreed with it."  Mot. App. Ex. 11 at 124* n.2.

[17] There is no dispute that the position of Investigator Trainee exists to train for the Welfare Fraud Investigator position, which required completion of the Police Academy.

wrongful termination.  Even if she had, she has not demonstrated that Defendants'

legitimate, nondiscriminatory reason for terminating her—her failure to complete

necessary training—was "unworthy of credence," see Lyons v. England, 307 F.3d 1092,

1113 (9th Cir. 2002), and that they really terminated her because they regarded her as

disabled.  See Bergene v. Salt River Project Agr. Imp. & Power Dist., 272 F.3d F.3d 1136,

1142 (9th Cir. 2001) (circumstantial evidence of pretext must be "specific and

substantial").

## 2.    Retaliation

Under the ADA, an employer may not retaliate "against any individual because

such individual has opposed any act or practice made unlawful [under the ADA] or

because such individual has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. §

12203(a).  To establish a claim for retaliation under the ADA,  Penhall must demonstrate

that "(1) . . . she engaged in or was engaging in activity protected by the ADA, (2) the

employer subjected [her] to an adverse employment decision, and (3) that there was a

causal link between the protected activity and the employer's action."  See Barnett v. U.S.

Air, Inc., 228 F.3d 1105, 1121 (9th Cir. 2000), vacated on other grounds, 535 U.S. 391

(2002).  The Ninth Circuit requires but-for causation in this context.  T.B. v. San Diego

Unified Sch. Dist., 806 F.3d 451, 473 (9th Cir. 2015); Davis v. Phillips 66, No. 17-cv-128-

JST, 2018 WL 3118913, at *3 (N.D. Cal. June 26, 2018) (where opposition to not getting a

reasonable accommodation was a substantial motivating reason for discharge, but

employee's other conduct was also a substantial motivating reason, protected activity was

not the but-for cause of termination because employer would have terminated him

anyway).  Retaliation claims under the ADA are also subject to the burden-shifting

framework of McDonnell Douglas.  Curley v. City of N. Las Vegas, 772 F.3d 629, 632

(9th Cir. 2014).

Here, Defendants argue that Penhall's ADA retaliation claim fails because (a)

Penhall's submission of a grievance through her union does not qualify as protected

activity and (b) the timing fails to demonstrate causation.  The Court agrees as to the second point.

### a.      Protected Activity

Whether the grievance satisfies the definition of making "a charge, testif[ing], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this chapter," 42 U.S.C. § 12203(a), is debatable.  But Defendants' argument that "the grievance is [none] of those things" because "[a]t best" it was just "seeking to be sent to [a] different course, not claiming violations under the ADA," Mot. at 15, is not entirely persuasive.  While Penhall did not explicitly reference the ADA, her grievance referred to the Specialized Investigator Course as "a reasonable accommodation," which most employers would presumably recognize as invoking the ADA.  Thus, unlike in James v. San Francisco Unified Sch. Dist., No. 18-cv-4448-YGR, 2018 WL 4635640, at *3 (N.D. Cal. Sept. 27, 2018), the only case Defendants cite on this point, see Mot. at 15, where Judge Gonzalez Rogers held that an employee "filing a grievance against his supervisor related to the supervisor's handling of the student's aggression" did not implicate the ADA, here the grievance was chiefly about Penhall seeking "a reasonable accommodation" to the required training in order to avoid re-injury.  See Mot. App. Ex. 7. It more closely implicates the ADA.  See Davis, 2018 WL 3118913, at *2 ("making a good faith request for a reasonable accommodation is a protected activity" under the ADA). Defendants' first argument likely fails.

### b.      Causation

Defendant's second argument is more persuasive.  The Ninth Circuit has explained that "very close temporal proximity between a protected activity is itself evidence of pretext."  Curley, 772 F.3d at 634.  Howe did not terminate Penhall immediately after she filed the grievance.  Instead, nearly seven months passed between Penhall's filing of the grievance, on January 23, 2018, and her termination, on August 14, 2018.  This undermines the notion that the former caused the latter.  See Hedenburg v. Aramark Am. Food Servs., Inc., 476 F. Supp. 2d 1199, 1209 (W.D. Wash. 2007) (no causation when

23

over seven months between protected activity and adverse action).

It is not simply a matter of time, though.  The complete record reflects that Defendants terminated Penhall at the completion of the grievance process when Howe's position—that he had the authority to determine that "the Basic POST Academy training better meets the needs of the Department" than the Specialized Investigator Course, Mot. App. Ex. 10 at 3—was vindicated, when over a year had passed and Penhall had not completed her training, Howe Depo. at 81:18-25; FAC ¶ 12 (acknowledging this requirement), when Howe had consulted with Penhall about alternative employment with the County, see Howe Depo. at 58:9–25, Penhall Depo. at 134:21–135:1, and when there was essentially nothing left to do with an employee who—without a documented justification—was effectively refusing to do the required training, see Mot. App. Ex. 11 (Skelly Memorandum: "She has been provided ample opportunity to complete the training, and the only reason she failed to attend the training academy was because she stated she was likely to re-injure herself.  At the time the decision was made to terminate her employment, there was no documentary evidence from any medical professional to support her claim of being at risk of injury.").

Nor is the grievance the but-for cause of Penhall's termination, as Defendants would surely have terminated Penhall for effectively refusing to attend the Police Academy training within one year whether or not she requested a reasonable accommodation in her grievance.  See Davis, 2018 WL 3118913, at *3 (where employee's other conduct was also a substantial motivating reason for termination, protected activity was not the but-for cause of termination because employer would have terminated him anyway).

Even if Penhall had established a prima facie case of retaliation, she has not demonstrated that Defendants' legitimate, nondiscriminatory reason for terminating her—her failure to complete necessary training—was "unworthy of credence," see Lyons v. England, 307 F.3d 1092, 1113 (9th Cir. 2002), and that they really terminated her as

24

punishment for having filed a grievance.[18]  See Bergene v. Salt River Project Agr. Imp. & Power Dist., 272 F.3d F.3d 1136, 1142 (9th Cir. 2001) (circumstantial evidence of pretext must be "specific and substantial"); see also Brooks v. Capistrano Unified Sch. Dist., 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014) ("mere temporal proximity is generally insufficient to show pretext.").  That Howe made "peremptory comments denying her request for accommodation" and stated "that he viewed her request as []tantamount to a refusal to do the Basic academy course," see Opp'n at 17, is not evidence of pretext given Dr. Weiss's releases.  See Penhall Depo. at 44:14–21, 68:5–6, 74:8–11 (initial release was with "no restrictions."); Mot. App. Ex. 6 at 98* (Dr. Weiss wrote "Yes, Full duties" in response to the question "[i]s the recruit cleared for full and unrestricted participation in the police academy.").  Nor is Howe's "immediately removing her from the enrollment into the Basic academy once he received her formal request through the grievance," see Opp'n at 15, evidence of pretext given his explanation that it would not have made sense to send Penhall to the Police Academy if the grievance process resulted in a ruling in Penhall's favor, Howe Depo. at 42:9–11.

Because there is no evidence of pretext, Penhall has failed to establish a retaliation claim under the ADA.  See Curley, 772 F.3d at 633 ("we need not decide whether Curley established a prima facie case of retaliation because he cannot show pretext.").

 The Court therefore grants the motion as to the ADA claim on both the wrongful termination and retaliation bases.

### C.  Violation of FEHA for Disability Discrimination (claim 2)

Penhall argues that the County violated FEHA by "terminating her employment . . . because the defendants regarded her as having a disability that limited her ability to perform the major life activities" of "working, physical activities such as pushing, pulling,

---

[18] Penhall's suggestion in her opposition brief that the protected activity at issue "goes beyond the filing of the union grievance," Opp'n at 15, goes beyond the FAC, see FAC ¶ 62 ("Defendants terminated Plaintiff also in retaliation for asserting her rights through the union grievance procedure").

lifting heavy objects, climbing and other range of motion activities." FAC ¶¶ 64, 72.[19]
Under FEHA, it is unlawful for an employer "to discriminate against the [employee] in
compensation or in terms, conditions, or privileges of employment" due to the employee's
physical or mental disability.  Cal. Gov't Code § 12940(a).  FEHA further prohibits
discriminating against an employee because she is "regarded or treated by the employer . .
. as having, or having had, any physical condition that makes achievement of a major life
activity difficult."  Cal. Gov't Code § 12926(m)(4).  The McDonnell Douglas burden-
shifting framework applies to disability discrimination claims under FEHA.  See Guz v.
Bechtel Nat'l, Inc., 24 Cal 4th 317, 354 (2000).  It requires Penhall to first establish a
prima facie case of discrimination by showing: (1) that she suffers from a disability; (2)
that she was otherwise qualified to do her job; (3) that she was subjected to an adverse
employment action; and (4) indica of discriminatory motive.  See Faust v. Cal. Portland
Cement Co., 150 Cal. App. 4th 729, 745 (2007).  If Penhall can establish all of the
elements of a prima facie case, Defendants would then have the burden of proffering a
legitimate, non-discriminatory reason for its adverse employment actions.  See id.  If they
can do so, the burden would then shift back to Penhall to offer evidence that Defendants'
stated reason was either false or pretextual, or evidence that Defendants acted with
discriminatory animus, or evidence of each that would permit a reasonable factfinder to
conclude that Defendants intentionally discriminated against her.  See id.

       As discussed above in the context of Penhall's ADA discrimination claim, there is
simply no evidence that Defendants regarded Penhall as disabled.  This is so even though
FEHA's definition of "disabled" is broader than the ADA's.  See Bryan v. United Parcel
Serv., Inc., 307 F. Supp. 2d 1108, 1111 (N.D. Cal. 2004), aff'd sub nom. E.E.O.C. v.
United Parcel Serv., Inc., 424 F.3d 1060 (9th Cir. 2005) ("A physical disability under
FEHA is defined as an impairment that limits an individual's ability to participate in
a major life activity. . . . unlike the ADA, FEHA does not require that an impairment

---

[19] The Court's earlier order on the motion to dismiss the FAC narrowed this claim to only
the "regarded as" theory.  See Order on MTD FAC at 10.

26

1    substantially limit a major life activity."); see also id. at 1111–12 (noting that "'working' is

2    a major life activity, regardless of whether the actual or perceived working

3    limitation implicates a particular employment or a class or broad range of employments.").

4    There is no evidence that Defendants viewed Penhall as limited in a major life activity: Dr.

5    Weiss cleared her to participate in the Police Academy as of December 21, 2017, Mot.

6    App. Ex. 6 at 98*, and Howe believed that Penhall was cleared and should participate in

7    the Police Academy, see, e.g., Howe Depo. at 44:1–13 ("I had nothing before me other

8    than a complete medical release.").  Nor is there evidence that Defendants terminated

9    Penhall because of a perceived disability; instead they terminated her for failing to

10   complete necessary training.

         Accordingly, the Court grants the motion as to the FEHA discrimination claim.

### D.  Violation of FEHA for Failure to Provide Reasonable Accommodations and Failure to Engage in Interactive Process (claim 3)

         Penhall argues that the County violated FEHA when it (1) failed to provide a

reasonable accommodation to enable her to perform all the essential functions of the

permanent Welfare Fraud Investigator position,[20] and (2) failed to engage in the interactive

process.  FAC ¶¶ 80–83.[21]

#### 1.  Reasonable Accommodation

         "FEHA requires employers to make reasonable accommodation for the known

disability of an employee unless doing so would produce undue hardship to the employer's

operation."  Nealy v. City of Santa Monica, 234 Cal. App. 4th 359, 373 (2015).  To prevail

on a reasonable accommodation claim, Penhall must establish that: (1) she has a disability;

(2) she could perform the essential functions of the job with reasonable accommodation;

---

[20] The Court previously explained: "Under the ADA, Penhall could not proceed on her disability discrimination claim under a failure to accommodate theory, because the ADA does not require an employer to accommodate an employee whom the employer regards as disabled. See 42 U.S.C. § 12201(h). In contrast, courts have held that FEHA may in certain circumstances require an employer to reasonably accommodate an employee who it regards as disabled. See Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 60 (2006)."  Order re MTD FAC at 11.

[21] The Court's order on the motion to dismiss the FAC narrowed this claim to only the "regarded as disabled" theory.  See MTD FAC at 11–12.

United States District Court
Northern District of California

and (3) Defendants failed to reasonably accommodate her disability.  See id.  "[T]he employee bears the burden of giving the employer notice of disability. . . . This notice then triggers the employer's burden to take 'positive steps' to accommodate the employee's limitations."  Prilliman v. United Air Lines, Inc., 53 Cal. App. 4th 935, 950 (1997) (quoting Goodman v. Boeing Co., (1995) 127 Wn.2d 401).  "[T]he burden of proving the availability of a reasonable accommodation" also "rests on the employee."  See Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal. App. 4th 952, 984.  "While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other."  Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 54 (2006).

Defendants argue that Penhall's reasonable accommodation claim under FEHA fails for two reasons: first, because Penhall cannot prove that she gave notice of a disability; and second, because no accommodation was available.[22]  Their first argument relies on the blanket assertion that "Filing a grievance which indicates Plaintiff may be reinjured is not sufficient notice of a disability."  Mot. at 17.  But Defendants do not cite to any legal support for that assertion, id., and given the grievance's explicit reference to a "reasonable accommodation," Mot. App. Ex. 7 at 100*–101*, the Court is unpersuaded that they are correct.  Their better argument is the second one.[23]

Defendants persuasively argue that no accommodation was available to Penhall because—notwithstanding the job description for the Fraud Investigator position, which

---

[22] Defendants do not seem to argue that Penhall was not entitled to a reasonable accommodation because she fails to meet the first requirement: being disabled, or in this case, regarded as disabled.  But see Mot. at 18 ("no accommodation was necessary because Dr. Weiss reviewed the requirements and cleared her for attendance of the academy."); Reply at 19 (analogizing this case to case in which a plaintiff "failed to show that she was disabled under the ADA" and so "the department had no duty to accommodate her."). Nonetheless, this Court concludes that Penhall was not due a reasonable accommodation because Defendants did not regard her as disabled, as discussed above.

[23] Defendants also argue that Penhall "should be collaterally estopped from re-litigating the issue of whether the Special Investigators Course was available [as] a reasonable accommodation because the Lake County Board determined it was not, and that decision is final and binding."  Id.  However, this order concludes above that collateral estoppel does not apply.

allows for completion of either (1) the P.O.S.T. Certified Police Academy ("Police Academy") training or (2) the less physically demanding P.O.S.T. Certified Specialized Investigator Course ("Specialized Investigator Course") training, Howe Depo. at 51:20–25, 52:1–16—Howe "has determined that the Basic POST Academy training better meets the needs of his department and he has consistently required that training of all Welfare Fraud Investigator Trainee candidates." Mot. App. Ex. 10 at 120*–21*. This was not a rule that he made just for Penhall; for the last thirty years, LCPD has required all Investigator Trainees to complete the Police Academy. Howe Depo. at 52:21–24 ("that's the only training that Lake County welfare fraud investigator has ever received."); see also Penhall Depo. at 16:6–11 (when Penhall applied for the Trainee position, she knew that she would have to complete the Police Academy to become a Fraud Investigator).

It is undisputed, following Penhall's grievance, that the discretion regarding which of the two trainings is appropriate rests with Howe. Mot. App. Ex. 10 at 120*–21*. This makes sense: "Many jobs," like peace officers, "are physically demanding, and employers are entitled to evaluate whether applicants for those jobs are physically capable of performing them." Samdefur v. Dart, 979 F.3d 1145, 1152 (7th Cir. 2020). Howe considers the Police Academy to be superior for the Fraud Investigator position because Fraud Investigators are armed police officers who effectuate arrests and serve warrants. Howe Depo. at 52:17–21. That the job description allows for either training is not significant, as a written job description is "not dispositive" of what a position's requirements are. See Rorrer v. City of Stow, 743 F.3d 1025, 1039 (6th Cir. 1988) (adding that "Testimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states that a job function is essential."); see also Cripe v. City of San Jose, 261 F.3d 877, 887 (9th Cir. 2001) (under ADA, written job description is "evidence of the essential functions of the job" but "not conclusive"). In the exercise of his discretion and based on his understanding of what the job entails, Howe concluded that trainees had to take the Police Academy training. There was no alternative.

Accordingly, the Court grants the motion as to the FEHA reasonable

accommodation claim.

### 2.    Interactive Process

FEHA requires that an employer engage in a "timely, good faith interactive process . . . in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability of known medical condition."  Cal. Gov. Code § 12940(n).  To establish a failure to accommodate claim under FEHA, Penhall must demonstrate that: (1) she has a disability under FEHA, (2) she is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate her disability.  See Aparicio v. Comcast, Inc., 274 F. Supp. 3d 1014, 1029 (N.D. Cal. 2017) (citing Scotch v. Art Inst. of California–Orange Cnty., Inc., 173 Cal. App. 4th 986, 1009–10 (2009)).

Penhall fails to meet the required elements.  First, as discussed above, Defendants did not regard her as disabled.  Second, "the availability of a reasonable accommodation . . . is necessary" to a failure to engage claim.  See Nadaf-Rahrov, 166 Cal. App. 4th 952, 984.  And there was no reasonable accommodation available.  Accordingly, the Court grants the motion as to the FEHA interactive process claim.

### E.    Violation of FEHA for Maintaining Hostile Environment (claim 4)

Finally, Penhall argues that she was "subjected to unwanted harassing conduct because of . . . being regarded as having had a disability."  FAC ¶ 88.[24]  She alleges that Howe "openly and constantly harassed" her, confining her to her desk, "barring her from going into the field" and from participating in range practice, weapons training, and other training, preventing her from completing her training opportunities and treating her as "persona non gratis [sic]."  Id. ¶ 89.  To establish a claim from a hostile work environment in violation of FEHA, Penhall must establish: (1) that she was an employee of Lake County; (2) that she was subjected to harassing conduct because of a protected status; (3) that the harassing conduct was severe or pervasive; (4) that a reasonable person under the

---

[24] The Court's earlier order on the motion to dismiss the FAC narrowed this claim to only the "regarded as" theory.  See Order on MTD FAC at 10.

30

United States District Court
Northern District of California

circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (5) that Penhall considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (6) that Defendants participated in or assisted or encouraged the harassing conduct, (7) that Penhall was harmed; and (8) that the conduct was a substantial factor in causing Penhall harm.  See CACI No. 2522A; see also Leland v. City & Cnty. of San Francisco, 576 F. Supp. 2d 1079, 1101 (N.D. Cal. 2008) ("To prevail on a hostile work environment claim under Title VII, a plaintiff must show (1) that she was subjected to verbal or physical conduct because of a protected characteristic such as sex or race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment" and "Title

VII hostile work environment standards are equally applicable to FEHA").

Defendants argue that Penhall has failed to establish a hostile work environment claim because she was not perceived as disabled and therefore cannot "prove harassment due to a protected status."  Mot. at 20.  This is correct: because Defendants did not regard Penhall as disabled, the alleged harassment was not "due to a protected status."[25] Moreover, Penhall failed to oppose Defendants' motion as to this claim.  See generally Opp'n; see Reply at 6 ("Plaintiff fails to oppose this argument").  She has therefore abandoned this claim.  See Jenkins v. County of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (plaintiff abandoned claims by not raising them in opposition to motion for summary judgment).

The Court therefore grants the motion as to the FEHA hostile environment claim.

//

//

//

---

[25] Defendants also argue that the acts that Penhall complains of do not rise to the level of severe and pervasive harassment.  Id. at 21 (noting that being denied non-essential trainings cannot amount to harassment, and arguing that tasks involved with administrative leave were necessary).  The Court need not reach this question.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 30, 2022



CHARLES R. BREYER
United States District Judge